IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEVIN O'MALLEY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 09-303 Erie ) |
| WIRE WELD, INC., ERNEST HUMPHREYS, RICHARD KING, and DAVID HETH, | ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

Pending before the Court is a motion for summary judgment filed by the Defendants pursuant to Federal Rule of Civil Procedure 56. ECF No. 34. For the reasons that follow, that motion will be denied. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**I.  BACKGROUND**

Plaintiff Kevin O'Malley ("Plaintiff") is an adult male residing in Gwinnet County, Georgia. ECF No. 16 at ¶ 1. Defendant Wire Weld, Inc. ("Wire Weld"), is a Delaware corporation maintaining its principal place of business in Erie County, Pennsylvania. *Id.* at ¶ 2. Defendants Ernest Humphreys ("Humphreys"), Richard King ("King") and David Heth ("Heth") serve as officers and directors for Wire Weld. *Id.* at ¶¶ 3-5.

Wire Weld was established in 1983. ECF Nos. 36 & 38 at ¶ 2. It is in the business of manufacturing wire shelving systems designed to store and display merchandise. *Id.* During the fall of 2008, Wire Weld contracted with Fulcrum Executive Search and Transitions ("Fulcrum") to find a suitable candidate to serve as its President and Chief Executive Officer ("CEO"). *Id.* at ¶ 3. Plaintiff submitted his resume to Fulcrum in response to an advertisement posted on the Internet. *Id.* at ¶ 7. He was an attractive candidate for the advertised position because he had previous retail marketing experience in the northeastern United States. *Id.* at ¶ 9. Following an application process involving several candidates, Plaintiff was chosen to serve as Wire Weld's President and CEO. *Id.* at ¶¶ 8, 10.

Plaintiff entered into an employment agreement with Wire Weld on January 13, 2009. *Id.* at ¶ 13; ECF No. 16-1. Pursuant to the terms of the agreement, Plaintiff was entitled to an annual salary of $200,000.00, "customary benefits" and "incentive compensation." *Id.* at 1. The portion of the agreement discussing Wire Weld's payment obligations in the event of a termination provided as follows:

> Employment shall be on an at will basis and shall commence on January 5, 2009, provided, however, in the event of a termination without cause of the Employee, the Company shall continue to honor the payment obligations herein until the later to occur of: (a) December 31, 2009; or (b) ninety (90) days after the date of termination.

*Id.* Attached to the agreement was a document styled an "Equity Appreciation Agreement" which provided, in part:

> <u>"Termination for Cause"</u> means the termination by the Board of Employee's employment with the Corporation or any subsidiary thereof upon the occurrence of anyone or more of the following: (i) Employee's conviction by, or entry of a plea of guilty or nolo contendere in, a court of competent jurisdiction for any crime that constitutes a felony in the jurisdiction involved; (ii) Employee's misappropriation of funds or commission of an act of fraud upon the Corporation; (iii) gross negligence by Employee in the performance of such Employee's services to the Corporation; (iv) a material breach by Employee of a provision of this Agreement, or any other agreement to which Employee and the Corporation are party; or (v) a material failure by Employee to substantially perform his duties to the Corporation.

ECF No. 16-2 at 3. This document also required Plaintiff to keep "material non-public information" obtained during the course of his employment "in strict confidence," and to refrain from disclosing such information "to any person outside the Company except as pursuant to regular job performance in the best interests of the Company, to company advisors and if compelled to do so by law or court." ECF No. 16-1 at 1-2. The terms of Plaintiff's employment also required that he "not engage in any activity or enterprise" that was "competitive with the activity or enterprise of the Company." *Id.* at 2.

As the CEO, Plaintiff reported to Wire Weld's Board of Directors ("Board"). ECF Nos. 36 & 38 at ¶ 12. After the commencement of his employment, Plaintiff had several discussions with Humphreys and King concerning his management style. *Id.* at ¶ 26. Some of these discussions concerned his interactions with other members of Wire Weld's staff. *Id.* at ¶ 27.

Harvey Wigder ("Wigder"), the owner of Fulcrum, visited Wire Weld's Pennsylvania facility on February 16, 2009, to meet with Plaintiff. *Id.* at ¶ 29. Wigder also met with King and Heth on that occasion. *Id.* at ¶ 31. Shortly after the meetings, Wigder prepared a written report detailing his discussions with Plaintiff, King and Heth. ECF No. 37-3 at 6-9. The report included summaries of what had been said and agreed upon during the meetings. *Id.* at 7. Under a heading entitled "Cultural Differences," Wigder reported as follows:

> There are no rights and wrongs here but I felt that this discussion would eliminate misunderstandings; I felt that Kevin understood the values that were shared and will be more sensitive to those moving forward. There were also ideas shared about Kevin getting closer to hourly production staff.

*Id.* Under a heading entitled "Issues Concerning the role of the CEO," it was noted that everyone involved in the discussions had agreed that "the three principals" needed to meet on a regular basis to ensure that Plaintiff "had the knowledge of history and operations to be effective." *Id.* The recruitment of a Director of Finance and the solidification of "sales organization" were identified as Plaintiff's "highest immediate priorities." *Id.* Wigder also stated that Plaintiff had been encouraged to "become more familiar with other aspects of the operation and do more bonding with the rest of the staff." *Id.* Heidi Sheehan ("Sheehan") was hired to be Wire Weld's Director of Finance shortly thereafter. ECF No. 38-4 at 21.

In April 2009, Humphreys and Richard Paolino ("Paolino"), another member of the Board, met with Plaintiff to discuss his performance. ECF Nos. 36 & 38 at ¶ 41. Humphreys apparently gave King a "recap" of the meeting on the morning of April 27, 2009. ECF No. 37-6 at 34. In a message emailed to Paolino later that afternoon, Humphreys stated that Plaintiff was "either worried or pissed, or both." *Id.* (capitalization omitted).

Wigder met with Plaintiff again on May 13, 2009. ECF Nos. 36 & 38 at ¶ 46. In a memorandum to Plaintiff bearing that date, Wigder made the following observations:

> Unfortunately the consensus of the feedback that I have received is that you have failed in providing vision and in convincing the key individuals whose support you need that you are providing the leadership Wire Weld requires to succeed. This isn't about metrics, although they are important. It is more about leadership. If you want to succeed in this job, your priority must be to build trust in you, the belief that the company is in good hands and conviction that you are providing leadership.

ECF No. 37-3 at 10. The memorandum also contained a chart listing objectives and recommendations that Plaintiff was urged to consider. *Id.* at 10-13.

In a message emailed to Sheehan on the morning of May 14, 2009, Plaintiff sought approval for money to pay for an apartment in Erie, Pennsylvania, so that he did not have to continually stay in a hotel. ECF No. 37-4 at 20. He indicated that it would be cheaper for Wire Weld to pay for an apartment rather than to continue paying for his hotel room. *Id.* On May 15, 2009, King emailed a message to Wigder stating as follows:

> Please get back to Ernie and me today if possible with the plan you have communicated to Kevin.
>
> I am not comfortable at this point making a commitment for a 1 year lease, and the fact he's looking at this commitment tells me the message has not gotten through.

*Id.* at 19. In a response sent later that day, Wigder assured King that Plaintiff had "received the message loud and clear." *Id.*

Plaintiff contacted King on May 26, 2009, and sought permission to move into the apartment on June 1, 2009. ECF No. 37-6 at 31. The next day, King responded with a message stating that "renting the apartment" at that time could send "the wrong message" in the immediate aftermath of Plaintiff's meeting with Wigder. *Id.* at 30. King also admonished that Wire Weld was $300,000.00 "short" of covering its "debt obligations" and needed to reduce its "travel expenses." *Id.* In a message sent to King on the afternoon of May 27, 2009, Plaintiff stated as follows:

> I see no reason why you continue to fight me on this, especially after the company just purchased a fully loaded Suburban (over $50,000) for your use. My hotel expenses are about $1136/month, plus the necessity to eat out every meal, which adds at least $500/month. I see this as a way to save the company at least $4-600/month (forget my convenience—which is unimportant). I therefore conclude your logic is the Harvey feedback—I guess your [sic] hoping I just go away. Moving forward, I will be somewhat less deferential, and more effectively control all aspects of the company. (On that note I would plan to take over the payment allocations next week and check signing authority). If you feel the apartment is a bad approach then perhaps we should take it to the board. We can discuss tomorrow.

*Id.* Plaintiff's request for permission to move into the apartment at Wire Weld's expense was ultimately denied. ECF No. 38-6 at 76-77.

The Board held a meeting in Albany, New York, on June 15, 2009. ECF Nos. 36 & 38 at ¶ 65. At approximately 10:30 A.M. on June 17, 2009, Humphreys met with Plaintiff and informed him that his employment with Wire Weld was being terminated. *Id.* at ¶ 72. Plaintiff returned to his home in Atlanta, Georgia, shortly after learning of his discharge. *Id.* at ¶ 73. In an email to Humphreys later that afternoon, Plaintiff made the following statements:

> Thank you for the opportunity to perform the duties of CEO of Wire Weld to the best of my abilities. Per our conversation today you have indicated that you and the board have decided to make a change in the leadership of the company and terminated my position as CEO without cause. I expect you and the company will at least honor my contract, including continuing my weekly salary payments until December 31, 2009, (which would include continuing my health care coverage during that period, payment for any of my 4 weeks of unused vacation time and any unreimbursed expenses).

ECF No. 37-7 at 52. Humphreys responded to Plaintiff's email by letter dated June 23, 2009. ECF No. 16-3. In that letter, Humphreys stated:

> This letter is a follow-up to our meeting of last Wednesday regarding the termination of your employment with the Company. Specifically, please be advised that your termination is a "Termination For Cause." The Company has substantial and incontrovertible evidence that you have misappropriated Company funds on numerous occasions. As a result, other than the compensation due to you through the close of business on Wednesday, June 17, 2009, the effective date of your termination, you have no other rights under your Employment Agreement, and all rights previously granted to you under the Equity Appreciation Agreement, dated as of January 1, 2009, are hereby terminated.
>
> You should be aware that this matter is being taken very seriously. Once our investigation is complete and the exact magnitude of what has been misappropriated determined, the Company will demand that all such amounts be promptly repaid.

*Id.*

Plaintiff commenced this action against Wire Weld in the Superior Court of Gwinnet County, Georgia, on August 14, 2009, contending that Wire Weld had breached its contractual obligations by refusing to compensate him as if he had been terminated "without cause." ECF No. 1-2 at 2-7. Wire Weld responded on October 9, 2009, by removing the action to the United States District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1441. ECF No. 1. On October 20, 2009, Wire Weld challenged the District Court's *in personam* jurisdiction by

filing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2). ECF No. 2. In a memorandum opinion and order dated December 7, 2009, the District Court determined that it could not exercise *in personam* jurisdiction over Wire Weld. ECF No. 5 at 3-21. Relying on 28 U.S.C. § 1631, the District Court cured the jurisdictional defect by transferring Plaintiff's action to this Court. *Id.* at 21-22. On May 5, 2010, Plaintiff amended his complaint to add claims under Pennsylvania's Wage Payment and Collection Law ("WPCL") [43 PA. STAT. § 260.1 *et seq.*].

## II. STANDARD OF REVIEW

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories in order to show that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## III. DISCUSSION

Defendants contend that summary judgment is appropriate because the record establishes that the Plaintiff's termination for cause was justified. Alternatively, the Defendants contend that summary judgment is appropriate under the doctrine of after-acquired evidence. I will now address each of these contentions in turn.

### A. Termination for Cause

In support of their contention that the Plaintiff's termination for cause was justified, the Defendants rely exclusively on that portion of the Equity Appreciation Agreement which defines "[t]ermination for cause" as follows: "…(v) *a material failure by Employee to substantially perform his duties to the Corporation.*" ECF No. 16-2 at 3 (emphasis supplied). At oral argument, counsel for the Defendants explained the factual basis for the contention that the Plaintiff had substantially failed to perform his duties:

. . .

> THE COURT: So fundamentally, then, is it accurate to say that he was terminated, the material failure – let me put it this way. That the material failure in his substantially failing to perform his duties revolved around leadership issues or lack thereof?
>
> MR. SNETHEN: Leadership issues is probably the overarching factor here. But there are also issues about – that speaks to leadership as well. … The central theme was definitely leadership.

. . .

ECF No. 45 at 7. The central issue, therefore, is whether there is a triable issue of fact as to whether the Plaintiff's termination for cause was objectively reasonable. "[T]he question as to whether an employee has materially breached an employment contract and whether that employee can thereafter be discharged for cause is a question of fact for the jury if *reasonable persons* might differ as to whether the alleged misconduct justified discharge." *Von Gonten v. Research Systems Corp.*, 739 F.2d 1264, 1267 (7th Cir. 1984) (emphasis added).

The minutes of the Board meeting conducted on June 15, 2009, contain no reference to the termination of Plaintiff's employment. ECF No. 38-9 at 8-9. King and Humphreys both testified that they could not recall any discussion at the Board meeting concerning the terms of Plaintiff's contract. ECF No. 38-4 at 41; ECF No. 38-5 at 36-37. Plaintiff testified that Humphreys had promised to "get back to [him] with a package" during the meeting conducted

7

on June 17, 2009. ECF No. 38-6 at 122. He stated that Humphreys had not specified whether his employment was being terminated "for" or "without" cause. *Id.* at 126. Humphreys acknowledged that he and Plaintiff had not discussed the terms of the separation during the meeting. ECF No. 38-5 at 44-45. Shortly after the meeting, Plaintiff emailed Humphreys a message reminding him of Wire Weld's payment obligations under the contract. ECF No. 37-7 at 52. In a letter dated June 23, 2009, Humphreys informed Plaintiff that he had been terminated "for cause." ECF No. 16-3. The "cause" for Plaintiff's discharge referenced in the letter was "substantial and incontrovertible evidence" that he had misappropriated Wire Weld funds "on numerous occasions." *Id.* The letter did not state that Plaintiff had "materially failed" to "substantially perform" his duties.

King testified that Plaintiff had been discharged because of his "[p]oor performance" as Wire Weld's CEO. ECF No. 38-4 at 26. In a subsequent declaration, King stated that Board members had given Plaintiff "concrete particulars" that he needed to address in order to improve Wire Weld's position, and that no "meaningful improvement" in his "performance and leadership" had been observed. ECF No. 43-1 at 1, ¶¶ 6-7. King asserted that Plaintiff had "arrived late" for the Board meeting in Albany. *Id.* at 2, ¶ 8. He described Plaintiff's presentation to the Board as "ill-prepared and disappointing." *Id.* In his own declaration, Wigder stated that his discussions with Humphreys, King and Heth on May 13, 2009, had left him with the impression that the Board was "extremely dissatisfied" with Plaintiff's "performance and leadership abilities." *Id.* at 6, ¶ 19.

Humphreys testified that he had asked Plaintiff to prepare a "strategic plan" for Wire Weld, and that Plaintiff had never completed that task "with any degree of precision." ECF No. 38-5 at 24. Humphreys acknowledged, however, that Plaintiff had not been given a "specific deadline" for the completion of that task. ECF No. 38-5 at 38. In a declaration dated September 9, 2011, Plaintiff stated that the Board had never ordered him to complete an assignment by a specific date, and that he had never refused to complete an assignment given to him by the Board. ECF No. 38-8 at 4, ¶¶ 19-20. When asked whether Plaintiff had failed to show up for work or refused to carry out the Board's instructions, Humphreys responded in the negative. ECF No. 38-5 at 38. In his memorandum of February 16, 2009, Wigder recommended that Plaintiff recruit a Director of Finance. ECF No. 43-1 at 9. King testified that Sheehan had been hired to fill that position in February or March of 2009. ECF No. 38-4 at 21.

8

The record indicates that Wire Weld's earnings had plummeted before the commencement of Plaintiff's duties. Humphreys testified that Wire Weld's "earnings before taxes" had decreased from $5,000,000.00 in 2007 to $750,000.00 in 2008. ECF No. 38-5 at 16-17. He attributed this decrease to Wire Weld's loss of a major Australian customer. *Id.* at 17. The Board's goal for 2009 was to increase Wire Weld's "earnings before taxes" to $2,000,000.00. *Id.* at 16. The terms of Plaintiff's employment contract provided for incentive compensation in the event that Wire Weld was able to reach that goal. ECF No. 16-1 at 1. Plaintiff, of course, was discharged more than six months before the end of 2009.

I conclude, on this record, that the objective reasonableness of the Plaintiff's termination for cause is a question properly resolved by a jury. The Boards' subjective displeasure with the Plaintiff's management or leadership style, in the absence of concrete particulars, cannot be said to be objectively reasonable as a matter of law. Moreover, Plaintiff disputes that he failed to follow the directives of the Board or in any other manner failed to substantially perform his duties. *Gresham v. Lumbermen's Mut. Cas. Co.,* 404 F.3d 253, 260 (4th Cir. 2005) ("whether cause existed for termination is usually a factual question for the jury"); *Ott v. Buehler Lumber Co.,* 541 A.2d 1143, 1145 (Pa. Super. Ct. 1988) ("where the evidence to sustain the justification for discharge is disputed, the jury must pass on it.").

### B.  After-Acquired Evidence

In order for the Defendants to successfully assert the after-acquired evidence defense based on the Plaintiff's alleged misconduct they must "establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362-63 (1995).[1] In his letter of June 23, 2009, Humphreys stated that Plaintiff had been terminated "for cause" because of "substantial and incontrovertible evidence" suggesting that he had misappropriated Wire Weld funds "on numerous occasions."[2]

---

[1] In *Dobinsky v. Crompton & Knowles Colors, Inc.*, Civil Action No. 02-1291, 2004 WL 2303686, at *5, 2004 U.S. Dist. LEXIS 20374, at *15-16 (M.D.Pa. March 30, 2004), the United States District Court for the Middle District of Pennsylvania predicted that the Pennsylvania Supreme Court would adopt the "after-acquired evidence" doctrine and treat it as a defense to a breach-of-contract claim in an appropriate case. I agree with *Dobinsky's* conclusion in that regard.

[2] Humphreys testified that the investigation into Plaintiff's expenses had begun on June 17, 2009, in response to Plaintiff's abrupt departure from the meeting conducted earlier that day. ECF No. 38-5 at 46-47. Hence, it is undisputed that the evidence of Plaintiff's alleged "misappropriation of funds" was not acquired until after he had already been discharged.

ECF No. 16-3. At oral argument, however, the Defendants' counsel clarified that the sole basis for the after-acquired evidence defense was the Plaintiff's alleged disclosure of sensitive financial information to an outside party. ECF No. 45 at 24.

During the course of his employment with Wire Weld, Plaintiff became romantically involved with Maureen Tucker ("Tucker"). ECF No. 38-8 at ¶ 36. He sought Tucker's assistance for the purpose of improving Wire Weld's website. *Id.* at ¶ 39. On March 30, 2009, Plaintiff forwarded to Tucker information that had been provided to him by Walter Pincus ("Pincus"), who was serving as Wire Weld's Director of Sales. ECF No. 37-7 at 27. In his declaration, Plaintiff stated that the information sent to Tucker on that occasion had contained no useful information about Wire Weld, and that he had forwarded it to Tucker simply to express his frustration with Pincus' job performance. ECF No. 38-8 at ¶ 45. Plaintiff forwarded Wire Weld's "2009 updated sales forecast" to Tucker on April 30, 2009. ECF No. 37-7 at 2. In her own declaration, Tucker stated that the sales forecast had been sent to her so that she could "try to develop a strategy to make Wire Weld's website more attractive and accessible to its then-current and prospective customers." ECF No. 38-15 at 2-3, ¶ 14. She declared that she had kept the sales forecast confidential and used it "only in conjunction with her efforts to assist Wire Weld." *Id.* at 3, ¶ 15. On June 11, 2009, and June 16, 2009, Tucker received invoices from the Reinhart Consulting Group, LLC, in the amounts of $200.00 and $100.00 for computer-related work that had been performed for Wire Weld. ECF No. 38-15 at 10, 12. She forwarded the invoices to Plaintiff so that the expenses could be properly billed to Wire Weld. *Id.* at 9, 11. Tucker apparently received no compensation for her assistance. ECF No. 38-8 at ¶ 41; ECF No. 38-15 at 2, ¶ 11.

Based on this record, I conclude that there is a material issue of fact as to whether the Plaintiff's conduct in sharing information with Tucker "was of such severity" that he would have been terminated had the Defendants known of it at the time of his discharge. *McKennon*, 513 U.S. at 362-63.

## IV.   CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment will be denied. An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEVIN O'MALLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 09-303 Erie |
| | ) |
| WIRE WELD, INC., ERNEST HUMPHREYS, RICHARD KING, and DAVID HETH, | ) ) ) ) |
| | ) |
| Defendants. | ) |

## ORDER

AND NOW, this 9th day of February, 2012, and for the reasons set forth in the accompanying Memorandum Opinion, IT IS HEREBY ORDERED that the Defendants' Motion for Summary Judgment (ECF No. 34] is DENIED.

                                                                     s/ Sean J. McLaughlin
                                                                     United States District Judge

cc: All counsel of record.